# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

| | | |
|---|---|---|
| VISTA BANK, | § | |
|     *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| CALCOT, LTD. | § | |
|     *Defendant.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW VISTA BANK, ("Plaintiff" or "Vista Bank") and files this Original Petition against CALCOT, LTD., ("Defendant" or "Calcot") and would respectfully show the Court as follows:

## I.
## INTRODUCTION

1. Vista Bank holds first-priority, perfected liens and security interests (the "Security Interests") in Collateral[1] which includes among other things the Debtors'[2] cotton and all proceeds therefrom. Calcot, a cotton marketing cooperative, was fully aware of Vista Bank's senior secured lien rights. While Calcot was authorized to market and sell the Debtors' cotton, it was obligated and had a duty to remit the proceeds from Debtors' cotton to Vista Bank to satisfy its Security Interests.

2. Despite this knowledge and duty, Calcot engaged in a calculated, twofold scheme to convert Vista Bank's Collateral. First, Calcot improperly used Vista Bank's Collateral to obtain over $15,000,000 in federal Marketing Assistance Loans ("MALs") through the Commodity

---

[1] As defined herein.
[2] Connor Wilmeth, Ashley Wilmeth, Wilmeth Farms LLC, and TMR Custom Farming LLC as further defined herein.

Credit Corporation ("CCC") funneling the loan proceeds to the Debtors, including Connor Wilmeth who sat on Calcot's Board of Directors. Second, upon selling the Debtors' cotton (Vista Bank's Collateral), Calcot created a self-serving payment waterfall. Rather than satisfying Vista Bank's Security Interests, Calcot paid itself fees for the improper loans, then repaid the improper and subordinate loans to the CCC, and paid other subordinate creditors. Only after enriching itself and others with Vista Bank's Collateral did Calcot tender to Vista Bank the depleted remainder of its Collateral proceeds.

3. This entire scheme was executed under a veil of secrecy, which Calcot actively maintained to prevent discovery. When Vista Bank began asking questions, Calcot refused to provide a meaningful accounting and stonewalled all requests for information, even in the face of a court order requiring cooperation. It was not until the end of May of 2025 that the extent of Calcot's multi-year fraud came to light. Calcot's intentional conversion, conspiracy with its board member, and fraudulent concealment of its actions have directly caused in excess of $15,000,000 in damages to Vista Bank.

## II.
## PARTIES

4. Plaintiff Vista Bank, is a Texas state bank, duly organized and charted and authorized to do business under the laws of the State of Texas, and maintains an office, banking location, and Market President at 1300 Summit Ave. Suite 100, Fort Worth, Tarrant County, Texas and maintains its principal place of business in the Northern District of Texas.

5. Defendant Calcot is a California agriculture cooperative corporation whose principal place of business is 3701 Pegasus Dr., Suite 108, Bakersfield, CA 93308. Defendant Calcot is also registered to do business in Texas and may be served with process by serving its registered agent Paracorp Incorporated (*aka* Parasec) at 14001 W. Highway 29, Suite 102, Liberty

Hill, Texas 78642, or wherever it may be found. Vista Bank requests the Clerk of the Court issue summons for service.

## III.
## JURISDICTION AND VENUE

6.     The Court has diversity jurisdiction over the subject matter of this action under 28 U.S.C. § 1332.  The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

7.     Plaintiff Vista Bank is a Texas state bank, duly authorized to do business under the laws of the State of Texas, and maintains its home office in Dallas County, Texas, making Vista Bank a citizen of the state of Texas for diversity purposes.

8.     Defendant Calcot is incorporated in California and maintains its principal place of business in Bakersfield, California.  Therefore, Calcot is a citizen of California for diversity purposes.

9.     Calcot is registered to conduct business in Texas and does conduct substantial business in Texas.  Calcot maintains employee(s), conducts business, and maintains operations in the Northern District of Texas and other partes of Texas.  Each and every year Calcot contracts with Texas cotton farmers to market and sell Texas farmed cotton for its Texas cotton farmer members.  Calcot maintains a cotton warehouse in Texas, has sales representative(s) in Texas, and contracts with warehouses, gins, and other parties throughout Texas as an integral part of its cotton marketing business. Calcot has sufficient minimum contacts with Texas.

10.    Venue in this District is proper under 28 U.S.C. § 1391(a)(1)-(2), (c).  Because Calcot is subject to personal jurisdiction in the Northern District of Texas, Defendant Calcot conducts substantial business in the Northen District of Texas and a substantial part of the events

or omissions giving rise to the claims at issue occurred in the Northern District of Texas venue in the Northern District of Texas.

## IV.
## FACTS

**A. Vista Bank Holds the First Lien Security Interest in the Debtors' Cotton and Cotton Proceeds.**

11. Wilmeth Farms, LLC ("Wilmeth Farms"), TMR Custom Farming, LLC ("TMR"), Connor Wilmeth ("Connor"), and Ashley Wilmeth ("Ashley") (collectively, the "Debtors")[3] farmed thousands of acres of cotton in and around Crosby County, Texas. From 2017 through today Vista Bank is and has been the first priority, perfected lien holder, effectively financing the cotton farming operations of the Debtors.

12. Vista Bank has loaned in excess of $12,000,000 to the Debtors in exchange for a priority, perfected security interest and lien in the Debtors' then owned and later acquired assets and all proceeds therefrom, including but not limited to: (1) farm products, crops, and livestock; (2) supplies used or produced in farming operations; (3) book credits, equipment, accessions, fixtures, and general intangibles, documents of title, warehouse receipts, and bills of lading; (4) all equipment, machinery, furniture, attachments, accessories, tools, parts, supplies, furnishings and fixtures of every type and description, and all accessories, attachments, accessions, substitutes, replacements thereof and software necessary to utilize, create, maintain, and process any such records and data on electronic media; (5) instruments, documents, and deposit accounts; (6) insurance refunds on any of foregoing property and goods; (7) products and proceeds of any property or goods; (8) accounts, accounts receivable, rights to payment, payments under any governmental agricultural assistance program, and any other program of the USDA, (9) records

---

[3] Upon information and belief, Wilmeth Farms and TMR is owned and/or controlled by Connor and Connor's father.

and data relating to any of the property and goods; (10) all proceeds derived or to be derived from any of the foregoing, and (11) all other assets described in the security agreements between the Debtors and Vista Bank (the "Collateral").

13. Vista Bank perfected its security interests in its Collateral by filing a multitude of UCC-1 financing statements with the Texas Secretary of State for each Debtor, all of which are still active through properly filed continuations. The Security Agreements executed by each Debtor expressly secure "all obligations, debts and liabilities, plus interest thereon, of [the Debtors]…as well as claims by [Vista Bank] against [the Debtors] …whether now existing or hereafter arising, whether related or unrelated to the note…whether obligated as a guarantor…[and] all future advances made by [Vista Bank to the Debtors] regardless of whether the advances are made a) pursuant to a commitment or b) for the same purpose." Each Security Agreement further provides that "[a]ll proceeds of any sale, consignment, lease, license, exchange, transfer, or other disposition of [crop, livestock or other farm product Collateral] shall be made immediately available to [Vista Bank] in a form jointly payable to [Wilmeth Farms and Vista Bank]."

14. As of early 2025, the Debtors owed Vista Bank in excess of $11,600,000.00 secured, in large part, by Vista Bank's Security Interest in and against the Debtors' crops, and farm products – including the Debtors' farmed cotton and proceeds therefrom.

15. The Debtors have defaulted under each loan and the Security Agreements and Vista Bank has filed suit against the Debtors seeking payment and collection of the amounts owed.[4]

**B. Calcot Tortiously Absconded with and Converted Vista Bank's Collateral Proceeds**

16. Calcot is a "cotton marketing cooperative" that markets for sale cotton produced by its members in Texas, California, Arizona, and New Mexico. Calcot is owned by its "members"

---

[4] *Vista Bank v. Wilmeth Farms, LLC et al*, Cause No. 20258579, pending before the 72nd Judicial District Court of Crosby County, Texas.

who are cotton farmers in one or more of the prior referenced states. Calcot is run and governed by its Board of Directors – upon information and belief at all relevant times, Connor was a member of Calcot's Board of Directors

17. The farmer members of Calcot do not sell their cotton to Calcot and Calcot does not buy their farmer members' cotton. Rather Calcot markets its farmer members' cotton for sale to third parties.

18. Calcot "pools" its members' cotton into seasonal pools or call pools depending on the desire of the member farmers. The cotton in the pools are often separated by quality, type, and location farmed. Calcot then markets the cotton for sale to buyers across the world. Upon the sale of each farmer member's cotton in each pool, Calcot (i) receives the proceeds (money) from sale the farmer' cotton, (ii) accounts for the proceeds from each farmer member's cotton, and (iii) sets off its proper costs as a cotton marketing cooperative. Calcot is then *supposed to* turn over the proceeds to each farmer member and/or the first lien security interest holder in that farmer members' cotton.

19. Calcot had actual knowledge of Vista Bank's Security Interest in the Collateral, which includes Debtors' cotton and proceeds, by and through actual notice provided to Calcot. Calcot had actual knowledge of Vista Bank's Security Interest in the Collateral by and through notice provided it by the Debtors. Indeed, when Calcot did tender some of the sale proceeds of the Debtors' cotton (Vista Bank's Collateral), Calcot did so via a joint check issued to Vista Bank and the respective Debtor—as required in the applicable loan documents. Moreover, Calcot had actual notice of Vista Bank's Security Interest in the Debtors' assets (including cotton) and proceeds therefrom by and through imputed knowledge through Connor—a member of Calcot's Board of Directors. Finally, Calcot had actual and constructive notice of Vista Bank's Security

Interest in the Debtors' assets (including cotton) and proceeds therefrom by and through the UCC-1 Financing Statements filed with the Texas Secretary of State.

20. Calcot, as a marketing cooperative, has the ability to facilitate MALs[5] from the CCC. With regards to the pooled cotton of its member farmers, Calcot acts as a Cooperative Marketing Association ("CMA"),[6] and as a CMA is allowed to take out MALs directly from the CCC for each farmer member's pooled cotton, for the benefit of such farmer member. However, Calcot could only act as a MAL and obtain a CCC loan for each famer member in a pool *if the MAL would be secured by a first priority lien against each famer member's pooled cotton*. In other words, Calcot could not take out a MAL loan from the CCC against the Debtors' pooled cotton because Vista Bank holds a first priority, perfected lien and security interest against each of the Debtors' crops and farm products, including cotton.

21. Despite Calcot's actual and constructive knowledge that Vista Bank held the first priority, perfected lien and security interest in all of the Debtors' farmed cotton from 2017 through 2025, Calcot intentionally and negligently ignored its obligations as a CMA and obtained multiple MALs against Vista Bank's Collateral for the benefit of the Debtors namely, Connor, Wilmeth Farms, and Ashley. Adding insult to injury, Calcot obtained the MALs each year *without* informing Vista Bank, *without* obtaining the USDA required lien waiver,[7] and *then paid the MAL loan proceeds to the Debtors.* Upon information and belief, Calcot procured well over $15,000,000 in MAL loans for the Debtors using Vista Bank's Collateral. Calcot, as a CMA, has a duty to verify that any cotton against which it obtains an MAL is free and clear of liens. If there is a priority lien against any cotton which Calcot intends to obtain an MAL as a CMA, Calcot must

---

[5] MAL loans are intended to be non-recourse as to the underlying farmer.
[6] In order for an entity such as Calcot to be a CMA, they must be officially approved by the USDA to serve as a CMA. Upon information and belief, Calcot is, and at all relevant times was, a CMA.
[7] 7 C.F.R. 1427.12(a).

procure lien waivers[8] from the priority lien holder prior to any MAL disbursements from the CCC. But, Calcot wholly failed to notify Vista Bank of it taking out MAL loans against its Collateral, much less obtain the required lien waivers.

22. Regardless of Calcot's improper actions, Vista Bank's Security Interest in the Debtors' cotton and the proceeds therefrom remained intact, the CCC's MALs were, at best, second in priority behind Vista Bank.

23. MALs are intended to be secured by farmed cotton and non-recourse as to the CMA and the farmer. Specifically, under a proper MAL loan the CCC is to be repaid on a MAL from either (i) the sale of the underlying cotton, or (ii) if the farmer so elects, the farmer may simply surrender the cotton secured by the MAL to the CCC as full payment, hence the requirement that the cotton secured by the MAL is free and clear of all other liens.

24. If the MAL is not secured by a first priority lien in favor of CCC, then the MAL immediately becomes recourse as to the CMA (here, Calcot), the CMA then has recourse against the subject farmer. Moreover, if the CMA (Calcot) obtains MALs for pooled cotton, and a portion of that pooled cotton is subject to liens and security interests that prime the CCC, the CCC and the USDA will revoke the CMA's authority to act as a CMA. If this were to happen, Calcot would immediately lose substantial revenue in both fees from acting as a CMA and withdrawal of its farmer constituents as members.

25. Despite the fact that Vista Bank maintained its Security Interest in the Debtors' cotton and proceeds therefrom, Calcot and the Debtors repeatedly took out MALs without informing Vista Bank, without tendering the MAL proceeds to Vista Bank, and without obtaining the legally required lien waivers from Vista Bank.

---

[8] Specifically, Calcot was to obtain USDA Form CCC-679 Lien Waiver executed by Vista Bank for each Debtor, each year a MAL was obtained.

26. Once Calcot sold the Debtors' cotton, Calcot obtained the proceeds from the Debtors' cotton – proceeds which Vista Bank holds the first priority, perfected liens and security interests. Calcot then paid itself from Vista Bank's Collateral proceeds for the costs and fees from its "marketing" efforts – including its alleged costs and fees in obtaining the improper and illegal MAL loans as a CMA. Going a step further, and in an effort to protect itself and its Board of Directors member (Connor), each and every year from at least 2017 through 2025 Calcot took it upon itself to first pay CCC for the MALs from Vista Bank's Collateral proceeds, then pay other subordinate creditors (as discussed below), then issue a joint check to Vista Bank and the Debtors for the difference. In short, Calcot intentionally, negligently, and fraudulently converted, misappropriated, and just stole Vista Bank's Collateral proceeds. Vista Bank was completely in the dark about Calcot's actions.

27. Calcot's improper and illegal distribution of Vista Bank's Collateral proceeds to other creditors did not end with the CCC. Upon receipt of the proceeds from the sale of the Debtors' cotton, and after Calcot paid itself and the CCC, Calcot and the Debtors decided that the Debtors' farm land landlords[9] should be paid from Vista Bank's Collateral proceeds *before* it paid Vista Bank. Once again, Vista Bank's liens as to the Debtors' cotton and proceeds therefrom was and are first priority, perfected liens and security interests – in front of the Debtors' landlords.[10] From 2017 through 2025 Calcot has improperly and illegally turned over millions of dollars of Vista Bank's Collateral proceeds to the Debtors' landlords.

---

[9] The Debtors primarily farmed leased land – land that the Debtors did not own.
[10] The Debtors' landlords are provided a statutory landlords' lien against a portion of the cotton farmed on their land, but Texas law mandates that the landlords' liens must be perfected via a UCC-1 Financing Statement filing with the Texas Secretary of State. Otherwise, the landlords' liens are unperfected and subordinated to all perfected liens against the same cotton. None of the Debtors' landlords filed UCC-1 Financing Statements with the Texas Secretary of State during the time that the Debtors were faming cotton and when Calcot was acting as the marketer for the Debtors.

28.     Due to Calcot's negligent, fraudulent, wrongful, and illegal acts, in excess of $15,000,000 of Vista Bank's Collateral was converted and effectively stolen – all of which should have been turned over to Vista Bank.

### C. Application of the Discovery Rule and Calcot's Fraudulent Concealment

29.     Calcot's wrongful conduct is ongoing and includes active concealment designed to prevent Vista Bank from discovering the full extent of Calcot's improper and illegal actions regarding Vista Bank's Collateral proceeds. As detailed above, Calcot was lawfully in possession of Vista Bank's Collateral – the Debtors' farmed cotton. Likewise, Calcot lawfully facilitated the sale of Vista Bank's Collateral. Upon the sale of the Debtors' cotton, Calcot was lawfully in possession of the proceeds from the sale of Vista Bank's Collateral. However, Calcot wrongfully, negligently, and fraudulently misappropriated and converted Vista Bank's Collateral proceeds by improperly taking out MALs against the Collateral, then turning over those proceeds of the sale of the Collateral to the Debtors, the CCC, the Debtors' landlords, other third parties, and itself.

30.     Vista Bank had no knowledge of (and did not have the ability to obtain knowledge of) Calcot's improper and illegal procuring MALs from the CCC against Vista Bank's Collateral, or Calcot' paying the CCC and the Debtors' landlords Vista Bank's Collateral proceeds. Calcot would simply cut joint checks to Vista Bank and the Debtors without providing any detail regarding the quantity, price, or timing of such sales of Vista Bank's Collateral.

31.     When Vista Bank began requesting information from Calcot regarding the sale and distribution of proceeds of Vista Bank's Collateral, Calcot immediately turned the matter over to its attorneys who demanded Vista Bank provide proof of the Debtors' default under the applicable loan documents prior to providing any information. Once that information was provided by Vista Bank, Calcot's attorneys refused to turn over any information regarding to whom Calcot paid Vista

Bank's Collateral proceeds – despite Vista Bank obtaining a court order allowing for and requiring parties such as Calcot to turn over all such information.

32.     It was not until a call in May of 2025 that Calcot, for the first time, informed Vista Bank that it had taken out the MAL loans from the CCC against Vista Bank's Collateral, paid millions of MAL proceeds to the Debtor, turned over millions of Vista Bank's Collateral proceeds to CCC rather than to Vista Bank, then turned over millions of Vista Bank's Collateral proceeds to the Debtors' landlords and other creditors.  On top of the foregoing, Calcot also set off its costs and fees for its illegal and improper acts against Vista Bank's Collateral proceeds.  When Vista Bank requested specific detail regarding Calcot's historical disbursement of all of Vista Bank's Collateral proceeds – Calcot's response was that Vista Bank should get a court order.  When Vista Bank reminded Calcot that it *did* have a court order requiring any person, co-op, business or entity of information regarding any of Vista Bank's Collateral to immediately provide any and all such information to and documents to Vista Bank, Calcot would only provide information regarding what it had paid to the Debtors' landlords in 2022 through 2025.

33.     To date, Calcot has refused to turn over any information regarding the amount of MAL proceeds that it paid to the Debtors, the amount of Vista Bank's Collateral proceeds that it wrongfully turned over to the CCC, the amount of Vista Bank's Collateral proceeds that it wrongfully turned over to the Debtors' landlords prior to 2022, the amount of Vista Bank's Collateral proceeds that it wrongfully turned over to other third parties, and the amount of Vista Bank's Collateral proceeds that it wrongfully set off for its wrongful and illegal actions.

34.     It is clear that Calcot has, for years, improperly and fraudulently hid the payment of, disbursement of, and use of Vista Bank's Collateral proceeds for its benefit and for the benefit of a member of its Board of Directors.  Calcot knew that it was holding Vista Bank's property—

the Debtors' cotton proceeds—and had a duty to turn over such property to Vista Bank and inform Vista Bank of any of Vista Bank's Collateral that Calcot did not turn over as required. Calcot's actions constitute fraudulent concealment which tolls any and all applicable statutes of limitations. Likewise, Vista Bank pleads the discovery rule as to any claim or cause of actions against Calcot.

## V.
## CAUSES OF ACTION

### A. Negligence

35. Vista Bank repleads and incorporates herein, in full, paragraphs 1 through 34 above.

36. Calcot owed legal duties to Vista Bank and others including but not limited to: (a) a duty to exercise reasonable care as to Vista Bank's Collateral – the Debtors cotton and proceeds therefrom; (b) a duty to not disburse or tender Vista Bank's Collateral proceeds to third parties (i.e. CCC, Debtors, and landlords, and itself); (c) a duty to properly account for and remit collateral proceeds in accordance with the security interests attached to such proceeds; and (d) a duty as a CMA to obtain the proper clearance, waivers and provide notices in obtaining MALs against Vista Bank's Collateral.

37. In 2017, 2018, 2019, 2020, 2021, 2022, 2023, 2024 and 2025 Calcot breached each of these duties of care by each year disbursing and turning over Vista Bank's Collateral – proceeds from the Debtors' cotton farmed each year – to the CCC, the Debtors, the Debtors' landlords themselves, and others.

38. Calcot's breaches of duty were a proximate cause of Vista Bank's damages, as Vista Bank would have received the cotton proceeds but for Calcot's negligent handling and disbursement of the funds.

39. As a direct and proximate result of Calcot's negligence, Vista Bank has suffered damages exceeding $15,000,000 in the form of proceeds it was entitled to receive.

### B. Conversion

40. Vista Bank repleads and incorporates herein, in full, paragraphs 1 through 39 above.

41. Vista Bank has ownership and possessory rights in all of the Debtors' farmed cotton and proceeds by virtue of its Security Interests, which attached to all farm products, including cotton crops, and proceeds therefrom.

42. Though Calcot was rightfully and legally in possession of Vista Bank's Collateral (the Debtors' cotton) and rightfully and legally sold Vista Bank's Collateral (the Debtors' cotton), Calcot assumed and exercised unlawful and control over the proceeds (money) of Vista Bank's Collateral by disbursing Vista Bank's Collateral to others, including the CCC, itself, the Debtors, and the Debtors' landlords, rather than tendering the proceeds from the MALs and the sale of the Debtors' cotton to Vista Bank as required.

43. As a direct and proximate result of Calcot's conversion, Vista Bank has suffered actual damages, plus consequential damages.

### C. Fraud

44. Vista Bank repleads and incorporates herein, in full, paragraphs 1 through 43 above.

45. Calcot made material misrepresentations to Vista Bank, including but not limited to representations that the amounts jointly paid to Vista Bank by Calcot were the total amounts that its cotton Collateral was sold for less proper costs.

46. These representations were false when made, and Calcot knew they were false or made them recklessly as positive assertions without knowledge of their truth.

47. Calcot made these misrepresentations with intent to deceive Vista Bank and prevent it from exercising its rights as a secured creditor.

48. Vista Bank justifiably relied on Calcot's representations regarding its handling of Vista Bank's Collateral, including farm products and proceeds therefrom.

49. As a direct and proximate result of Calcot's fraud, Vista Bank has been damaged in an amount exceeding the value of all converted Collateral and proceeds.

50. Calcot's fraud was committed willfully, intentionally, and with malice.

### D. Fraud by Non Disclosure

51. Vista Bank repleads and incorporates herein, in full, paragraphs 1 through 50 above.

52. Calcot concealed or failed to disclose facts to Vista Bank, including but not limited to (i) that it took out MALs from the CCC using Vista Bank's Collateral, (ii) that it disbursed in excess of $15,000,000 of Vista Bank's Collateral proceeds to the CCC, the Debtors, the Debtors' landlords, itself, and others, and (iii) the payments tendered jointly to Vista Bank and the Debtors were not all of Vista Bank's Collateral proceeds less reasonable and necessary costs.

53. Calcot had a duty to disclose to Vista Bank.

54. Calcot knew that Vista Bank was ignorant of such facts and Vista Bank did not have an equal opportunity to discover such facts.

55. Calcot was deliberately silent when it had a duty to speak.

56. By failing to disclose such facts, Calcot intended to induce Vista Bank to take action or refrain from taking action, namely requiring all of Vista Bank's prior Collateral proceeds and future Collateral proceeds be tendered to it, refusing to allow Calcot to market its Collateral, and call the loans against its Board of Director member—Connor.

57. Vista Bank relied on Calcot's non-disclosure.

58. Calcot's fraud by non disclosure was committed willfully, intentionally, and with malice.

59. As a direct and proximate result of Calcot's fraud, Vista Bank has been damaged in an amount exceeding the value of all converted Collateral and proceeds.

### E. Negligent Misrepresentation

60. Vista Bank repleads and incorporates herein, in full, paragraphs 1 through 59 above.

61. Calcot made representations to Vista Bank regarding its Collateral and the proceeds from its Collateral – the Debtors' cotton.

62. Calcot failed to disclose information to Vista Bank regarding its Collateral and the proceeds from its Collateral for which Calcot had a duty to disclose.

63. Vista Bank justifiably relied on Calcot's representations and failure to make require representations.

64. Calcot's negligent misrepresentations and failure to make representations proximately caused injury to Vista Bank.

### F. Civil Conspiracy

65. Vista Bank repleads and incorporates herein, in full, paragraphs 1 through 64 above.

66. Calcot entered into a combination with two or more persons, including Connor Wilmeth and other Debtors, to accomplish an unlawful purpose and/or to accomplish a lawful purpose by unlawful means.

67. The object of the conspiracy was to: a.) convert Vista Bank's Collateral for the conspirators' benefit; b.) divert proceeds away from Vista Bank despite its Security Interest; c.) conceal assets and transactions from Vista Bank; and d.) prevent Vista Bank from exercising its rights as a secured creditor.

68. There was a meeting of minds on the object and course of action, as evidenced by: a.) Connor Wilmeth's dual role as Debtor and as one of Calcot's directors; b.) coordinated refusals

to provide information to Vista Bank; and c.) systematic diversion of proceeds to conspirators and their designees.

69. The conspirators committed multiple unlawful overt acts as set forth herein.

70. Vista Bank has suffered damages as a proximate result of the conspiracy in an amount exceeding the value of all converted Collateral.

71. Each conspirator, including Calcot, is jointly and severally liable for all damages caused by the conspiracy.

### G. Punitive / Exemplary Damages

72. Vista Bank repleads and incorporates herein, in full, paragraphs 1 through 71 above.

73. Pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code, Vista Bank seeks recovery of exemplary and punitive damages from Calcot. The damages and harm suffered by Vista Bank resulted from fraud, malice, and gross negligence committed by Calcot. As detailed above, Calcot engaged in a multi-year scheme with the specific intent to cause substantial financial harm to Vista Bank by knowingly converting millions of dollars of its Collateral proceeds. Calcot acted fraudulently, with malice, and grossly negligent when, despite its actual knowledge of Vista Bank's Security Interest, it unlawfully procured federal loans against Vista Bank's Collateral and then misappropriated Vista Bank's Collateral proceeds to benefit itself, its board member, and other subordinate creditors. This conduct demonstrates an act and pattern of behavior that, when viewed from Calcot's standpoint at the time, involved an extreme degree of risk of which Calcot had actual, subjective awareness, but nevertheless proceeded with conscious indifference to the rights and welfare of Vista Bank. This fraudulent, malicious, and grossly negligent conduct was committed, authorized, and ratified by the management of Calcot, thereby entitling Vista Bank to an award of exemplary damages.

# VI.
# PRAYER

WHEREFORE, Plaintiff Vista Bank prays that this Court enter judgment against Defendant Calcot and award Plaintiff Vista Bank as follows: (i) actual and special damages in an amount in excess of $15,000,000; (ii) exemplary damages; (iii) reasonable and necessary attorneys' fees as allowed by law or equity; (iv) prejudgment and post-judgment interest; (v) all costs of court; and (vi) any other relief in law or equity to which Plaintiff is entitled.

Respectfully submitted,

BY: /s/   /s/ H. Brandon Jones
H. Brandon Jones
State Bar No. 24060043
brandon@bondsellis.com
Cash H. Barker
State Bar No. 24116073
cash.barker@bondsellis.com
**BONDS ELLIS EPPICH SCHAFER JONES LLP**
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900
(817) 405-6902 – Facsimile

**ATTORNEYS FOR PLAINTIFF, VISTA BANK**